**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARCIE ABERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12-cv-10181 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| BOARD OF EDUCATION OF THE CITY | ) | |
| OF CHICAGO and SUSAN A. LOFTON, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Marcie Aberman brings this action against Defendants Board of Education of the City of Chicago and Susan Lofton alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and the Illinois Human Rights Act ("IHRA") against the Board (Count I); disability discrimination in violation of the IHRA and the Americans with Disabilities Act ("ADA") against the Board (Count II); violations of the Rehabilitation Act § 504 against the Board (Count III); violations of the Family Medical Leave Act ("FMLA") against the Board and Lofton (Count IV); and breach of contract against the Board (Count VII).[1] Currently before the Court are the parties' cross-motions for summary judgment [111] and [129]. For the reasons stated below, the Court grants Defendant's motion for summary judgment on Plaintiff's federal claims in Count I through Count IV. In view of that disposition of the federal claims, Plaintiff's remaining state law claims are dismissed without prejudice. The Court will enter a final judgment and close the case.

---

[1] Plaintiff originally brought additional claims, which the Court has already dismissed. [43.]

# I.     Background

The following facts are drawn primarily from the parties' Local Rule 56.1 statements, [113], [129, Exhibit 56], [129, Exhibit 55], and [136].  Plaintiff, a former high school mathematics teacher, was given an "unsatisfactory" performance rating by a new principal, Defendant Susan Lofton, and was then terminated from her tenured position and placed in the Reassigned Teachers Pool.  Plaintiff has an auditory impairment and was over the age of forty at the time of reassignment.

## A.     Local Rules

As a preliminary matter, the Court notes that Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law.  Each party opposing a motion for summary judgment is then required to file "any opposing affidavits and other materials referred to in [Federal Rule of Civil Procedure 56(e)]" and a "concise response" to the movant's statement of facts containing "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials."  L.R. 56.1(b)(1), (3).  "A general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial."  *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000).  Local Rule 56.1(b)(3)(C) is not satisfied by "purely argumentative denials," *id.*, or "evasive denials that do not fairly meet the substance of the material facts asserted," *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000).  "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a forum for factual or legal argument."  *Malec*, 191 F.R.D. at 585.

Plaintiff's Response to Defendants' Statement of Facts [129, Exhibit 56] does not comply with these requirements. Many of Plaintiff's "concise responses" do not directly address Defendants' statement of facts but rather amount to lengthy recitations of unrelated allegations. [See, *e.g.*, 129, at ¶ 19.] Additionally, many of Plaintiff's denials assert facts without citations to the record, [see, *e.g.*, ¶¶ 4, 9, 20], cite exhibits which do not support the denial, [see, *e.g.*, ¶¶ 30, 33], or contain blank spaces with incomplete citations, [see, *e.g.*, ¶ 9 ("See Pl. Resp. to paragraph __. Further Denied to the extent that Darroch, or any other administrator, actually demonstrated a willingness or ability to address student behavior issues. __. Otherwise Denied.").] Moreover, some of the exhibits that Plaintiff cites are not in the record, [see, *e.g.*, Exhibit 2; Group Exhibit 12], or are allegedly "included on [sic] disk and filed under seal," [see, *e.g.*, Exhibit 51; Group Exhibit 8; Group Exhibit 10; Group Exhibit 11], yet said disk and courtesy copies of Plaintiff's filings were not delivered to the Court despite the Court's explicit instructions that courtesy copies should be delivered within 24 hours of filing and the Courtroom Deputy's follow-up request to Plaintiff's counsel.

Further, Exhibit 3, which Plaintiff frequently cites, is purportedly an "affidavit of Marcie F. Aberman." However, the document is not sworn, signed, or dated. [129, Exhibit 3, at 10.] An affidavit is admissible in a summary judgment proceeding only if it is sworn to before an officer authorized to administer an oath, such as a notary public. See *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985). Since Exhibit 3 is not sworn to before an officer authorized to administer an oath, it is not an admissible affidavit. Under 28 U.S.C. § 1746, an unsworn declaration which is dated and signed by the declarant "under penalty of perjury" and verified as "true and correct" may be used in lieu of a sworn affidavit to support or respond to a motion for summary judgment. See *DeBruyne v. Equitable Life Assur. Soc'y*, 920 F.2d 457, 471 (7th Cir.

1990). Although Exhibit 3 contains the language "I certify under penalty of perjury that the facts stated herein are true and correct," it is not signed or dated, and thus is not admissible as an unsworn declaration under 28 U.S.C. § 1746.[2] See *Trapaga v. Central States Joint Bd. Local 10*, 2007 WL 1017855 (N.D. Ill. March 30, 2007).

Because of these shortcomings in Plaintiff's filings, where Plaintiff responds to Defendants' Rule 56.1 Statement of Facts with an unsupported denial, a denial allegedly supported by an exhibit that is inadmissible or not in the record, an argument, or a legal conclusion, the Court will not consider that response, and Defendants' statement of fact will be deemed admitted. See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec*, 191 F.R.D. at 584; *Moore-Fotso v. Bd. of Educ. of the City of Chicago*, 2016 WL 5476235, at *2 (N.D. Ill. Sept. 29, 2016). Similarly, where Plaintiff's Rule 56.1(c) Statement of Additional Facts [129, Exhibit 55] contains unsupported assertions of fact, the statements will not be considered. Although the Court will exercise its discretion in the direction of leniency and consider the portions of Plaintiff's statements and responses that arguably meet the requirements of the local and federal rules, *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (making clear that, although district courts have discretion to require strict compliance with Rule 56.1, "[i]t does not follow * * * that district courts cannot exercise their discretion in a more lenient direction"), the Court notes that Plaintiff is not left with many facts to stand on. See *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 702 (7th Cir. 2010) (striking the parties' factual assertions that lacked direct citation to easily identifiable support in the record and explaining that "Judges are not like pigs, hunting for truffles buried in [the record]." (citation and internal quotation marks omitted)).

---

[2] Even if the Court were to consider Exhibit 3, it would not save the day for Plaintiff and defeat Defendants' motion for summary judgment, as discussed below.

The Court also notes that Plaintiff's brief improperly cites to raw record materials rather than to its Local Rule 56.1 statement, which is a blatant violation of the local rules. This violation of Local Rule 56.1, standing alone, is enough to deny Plaintiff's partial motion for summary judgment [129]. See *Sledge v. Bellwood Sch. Dist. 88*, 2011 WL 2457920, at *2 (N.D. Ill. June 17, 2011) (denying summary judgment motion based on movant's violation of Local Rule 56.1); *Daoust v. Abbott Labs.*, 2006 WL 2711844, at *4 (N.D. Ill. Sept. 19, 2006) ("Citing directly to the record in the memorandum statement of facts, as [the movant] does here, rather than citing to its 56.1(a)(3) statement, negates the purpose of the summary judgment exercise."). However, the Court will exercise leniency and consider the merits of Plaintiff's motion.

Finally, the Court notes that despite having been granted several extensions of time to file a reply brief and the Court's admonition that given the well-documented history of delay in this case, no further extensions would be granted absent the most extreme of emergencies, Plaintiff has failed to file a reply brief. Thus, the Court will decide the parties' cross-motions for summary judgment without Plaintiff's reply brief. See *Raymond v. Ameritech Corp.*, 442 F.3d 600, 606 (7th Cir. 2006) (district judge acted within his discretion by not excusing party's delay in filing response to summary judgment motion where case had dragged on for over one year, party had already obtained one extension to file response, and court gave clear notice of deadline).[3]

---

[3] On January 31, 2017 counsel for Plaintiff appeared in court on Plaintiff's motion for extension of time to file the reply brief and represented that the brief was ready to file. Accordingly, the Court granted the motion [see 141]. Inexplicably, the brief was not filed as of the time that the Court began working on this opinion. Finally, on March 15, 2017, Plaintiff's counsel sent an email to the Courtroom Deputy stating as follows: "It came to my attention that I was removed from the Master List of Attorneys after January 2017. I have been working to resolve the situation. But, until it is resolved, I have avoided making any filings with the court, in deference to the rules. I hope resolve the issue in the next few weeks." Given that Plaintiff has filed a 28-page brief in opposition to Defendant's motion for summary judgment and in

**B.     The Facts**

Turning to the facts of the case, Plaintiff worked as a mathematics teacher at Nicholas Senn High School ("Senn") from September 2005 through July 8, 2011.   [113, at ¶ 3.] Defendant Susan Lofton was Principal of Senn from May 3, 2010 through July 20, 2015 and was Plaintiff's direct supervisor.  [*Id.* at ¶ 4.]  During the 2010–2011 school year, Assistant Principals ("A.P.") David Darroch and Carter Carey assisted Principal Lofton in the administration of Senn. [*Id.*]

**1.     Plaintiff's Performance for the 2010–2011 School Year**

During the 2010–2011 School Year, Plaintiff was observed three times by Defendant Lofton (November 22, 2010, February 2, 2011, and March 15, 2011) and once by A.P. Darroch (March 14, 2011).  [See *id.* at ¶ 8.]  A.P. Carey also observed Plaintiff during his periodic teacher observations.  [*Id.* at ¶ 11.]

**a.     Defendant Lofton's Observations**

On November 22, 2010, Defendant Lofton conducted a formal observation of Plaintiff's seventh period algebra class.  [*Id.* at ¶ 12.]  A formal observation lasts a full class period and includes an examination of lesson plans, unit maps, gradebooks, and any evidence the teacher wants to provide.  [*Id.*]  During the observation, Defendant Lofton took notes and provided written feedback using an observation checklist.  [*Id.*]  On the Classroom Teacher Visitation Form, Defendant Lofton checked the "weakness box" next to fourteen of the provided performance criteria.  [*Id.*]  The weaknesses she observed included pedagogy issues, such as Plaintiff's failure to apply contemporary principles of learning theory and teaching methodology

support of her cross-motion, the Court concludes that the issues have been adequately briefed and waiting an indeterminate time for Plaintiff's counsel to be in position to file a reply brief is not warranted.

and failure to establish positive learning expectation standards for all students. [*Id.*] Defendant Lofton also observed weaknesses in basic teacher duties, such as Plaintiff's failure to keep current records of pupils' achievements and maintain an accurate gradebook, and in poor classroom management, which caused Plaintiff's students to be off task and to have private conversations during the lesson. [*Id.*] According to Defendant Lofton, Plaintiff also failed to adequately communicate the academic progress, attendance, and conduct of students to their parents and failed to initiate appropriate conferences with parents and administrators. [*Id.*] Defendant Lofton met with Plaintiff on December 2, 2010 for a post-observation conference and provided her with a list of suggestions for improvement. [*Id.* at ¶ 13.] On February 22, 2011, Defendant Lofton conducted another observation of Plaintiff's seventh period algebra class and did not see any improvement in Plaintiff's teaching performance. [*Id.* at ¶ 14.]

On March 15, 2011, Defendant Lofton conducted another formal observation of Plaintiff's eighth period algebra class. [*Id.* at ¶ 21.] She again took copious notes and provided written feedback on an observation checklist and during the post-observation conference. Defendant Lofton observed that Plaintiff exhibited no improvement in classroom management, did not differentiate instruction, did not implement vocabulary strategies, and that the rigor of the lesson was too low. She also noted that Plaintiff was not using the recommendations she had given to Plaintiff during previous observations. During the lesson, she found that Plaintiff exhibited student engagement and pacing issues and did not respond to students; the classroom was disruptive with one third to more than one half of students off task at any given moment; and the lesson was teacher-centered and students did not try to do the work because they had learned that Plaintiff would do it for them. [*Id.*] On the Classroom Teacher Visitation Form, Defendant Lofton checked the "weakness box" next to fifteen of the provided performance criteria, noting

pedagogical, organizational, classroom management, and student-relationship weaknesses. [See *id.*] Defendant Lofton observed that there was no improvement in Plaintiff's teaching performance between the November 22, 2010 and March 15, 2011 observations. [*Id.* at ¶ 23.] On March 16, 2011, Defendant Lofton held a post-observation conference during which she gave Plaintiff a list of suggested improvements. [*Id.* at ¶ 22.]

Plaintiff testified in her deposition that she agreed with the weaknesses identified by Defendant Lofton but that Defendant Lofton had "used the worst class to do the evaluation on." [See *id.* at ¶ 24; *id.*, Exhibit B, 102:23–104:13; 244:6–12.] However, Plaintiff also testified that during the 2010–2011 school year, she never complained to Defendant Lofton about the students in her algebra class, which is the class that Defendant Lofton observed. [*Id.* at ¶ 7; *id.*, Exhibit B, 82:17–21.] Plaintiff also agreed that she had trouble managing the students in her seventh and eighth period algebra classes. [*Id.* at ¶ 25.]

### b.     Assistant Principals' Observations

Defendant Lofton was not the only administrator who noticed Plaintiff's poor teaching performance. On March 14, 2011, A.P. Darroch observed Plaintiff's seventh and eighth period algebra classes. [*Id.* at ¶ 16.] He took nine pages of notes during the observation, noted that he was concerned by Plaintiff's subpar teaching performance, and checked the "weakness" box next to eleven of the evaluation criteria. [*Id.*] Like Defendant Lofton, A.P. Darroch noted that Plaintiff failed to apply contemporary principles of learning theory and teaching methodology and failed to show evidence of student performance and progress. [*Id.*] He observed several issues related to Plaintiff's classroom managements and relationships with her students, including (1) an excessive rate of off-task behavior, (2) a negative classroom climate impacting

teacher-student relationships, (3) Plaintiff's failure to exhibit an understanding and respect for

students as individuals, and (4) Plaintiff's use of a critical tone with students.  [*Id.*]

In his view, Plaintiff's "punitive and negative classroom management style * * *

contribut[ed] to discipline problems" and suggested that Plaintiff "consider positive tone and

reinforcements."  [*Id.*]  According to A.P. Darroch, during the lesson, Plaintiff relied heavily on

teacher-led instruction and demonstration and did not allow students to "own the lesson."  [*Id.*]

His notes indicate that Plaintiff engaged one student in setting up a formula.  [129, Exhibit 56, at

¶ 16.]  However, A.P. Darroch explained that Plaintiff did all the math problems and and did not

involve or engage students.  [113, at ¶ 16.]  He noted that Plaintiff failed to address numerous

student questions and requests.  [*Id.*]  After the March 14, 2011 classroom visit, A.P. Darroch

spoke with Defendant Lofton about his observations and expressed his concern regarding

Plaintiff's ability to manage her classroom and to effectively teach her students.  [*Id.* at ¶ 20.]

On March 16, 2011, A.P. Darroch had a discussion with Plaintiff about his observation

and presented suggestions for improvement.  [*Id.* at ¶ 17.]  Plaintiff testified in her deposition

that she agreed with A.P. Darroch's notes on the March 14, 2011 Classroom Visitation Form that

stated: "overreliance on teacher-led instruction / demonstrate or provide for greater student

ownership / higher-order thinking."  [*Id.* at ¶ 17.]  Plaintiff further testified that she did not know

if she believed that A.P. Darroch wanted her out of Senn and that she did not have any problems

with him.  [See *id.* ¶ 19; *id.* Exhibit B, 272:5–12.]

A.P. Carey periodically conducted teacher observations and visited classrooms while

class was in session.  [*Id.* at ¶ 11.]  He observed that Plaintiff did not establish a positive learning

culture in her classroom, often yelled at her students, had a chaotic classroom with students

yelling across the classroom, getting up from their seats and moving around without permission,

and openly defying Plaintiff. [*Id.*] He believed that Plaintiff was deficient in classroom management and that this had a negative impact on instruction. [*Id.*] Additionally, students complained to A.P. Carey that they were not learning anything from Plaintiff. [*Id.*]

### c. Plaintiff's Unsatisfactory Rating

Defendant Lofton gave Plaintiff an unsatisfactory rating on March 21, 2011. At the same time, she also presented Plaintiff with a remediation plan, per Board policy and the Collective Bargaining Agreement ("CBA") between the Board and the Chicago Teachers Union. [*Id.* at ¶ 32.] According to Defendant Lofton, she created the remediation plan for Plaintiff in hopes that her performance would improve over the course of the following year. [*Id.*] Plaintiff alleges that by March 30, 2011, there was a posting for an immediate opening in the Senn mathematics department and thus Defendant Lofton had started the process of hiring Plaintiff's replacement. [129, Exhibit 56, at ¶ 32; see also 129, Exhibit 14.]

### 2. Fitness for Duty Examination and FMLA Leave

### a. Plaintiff's Auditory Impairment

Plaintiff was diagnosed with hearing loss as a child. [113, at ¶ 5.] Plaintiff wore a hearing aid as a child, but the material would irritate her ear. [*Id.*, Exhibit B (Aberman Deposition), 123:6–8, 124:9–16.] A medical specialist suggested that Plaintiff use a hearing aid prior to the 2010–2011 school year, but Plaintiff never wore a hearing aid when she taught at Senn. [*Id.* at ¶ 5.] Plaintiff never told Defendant Lofton that she had a hearing impairment and did not ask Defendant Lofton, or any previous principals, for an accommodation for her hearing disability. [*Id.* at ¶ 6.] The first time that Plaintiff informed anyone at the Board that she had an auditory impairment was when she requested an accommodation in 2011. [*Id.*] Plaintiff alleges that because she had this hearing impairment since early childhood, her voice "evidences an

obvious difference that is readily associated with the hearing impairment." [129, Exhibit 55, at ¶ 26.]

### b. Events Leading Up to Fitness for Duty Examination

During post-observation conferences, Defendant Lofton asked Plaintiff if she heard what her students were saying during class (such as asking for help or openly talking about their social lives) and why she did not respond to them. [*Id.* at ¶ 34.] Plaintiff responded that she could hear them but that she wanted to move on in the lesson. Plaintiff asserted that the problem was that the students were troublesome and difficult to manage. Defendant Lofton asked Plaintiff what additional assistance she might need aside from the list of suggestions presented to her. Plaintiff responded that she did not need anything and that she would work on the listed suggestions. [*Id.*]

On or about January 11, 2011, two school-wide announcements were made on Senn's intercom system instructing teachers to keep students in the classroom until further notified because it was a "high-risk" day. [*Id.* at ¶ 35.] A.P. Carey informed Defendant Lofton that he found one of Plaintiff's students in the hall during class time that day. Defendant Lofton issued Plaintiff a Cautionary Note, which is a non-disciplinary written statement given to an employee advising her that the described misconduct is unacceptable and will lead to formal discipline if repeated. Defendant Lofton alleges that she spoke with Plaintiff about the incident and asked her if the intercom in her room was functioning, and Plaintiff told Defendant Lofton that the intercom worked fine. [*Id.*]

### c. Fitness for Duty Examination

Defendant Lofton felt that Plaintiff's teaching performance was unsatisfactory and had concerns about student safety in an environment where Plaintiff was not able to monitor her

surroundings and respond to student needs.  [*Id.* at ¶ 37.]  Because of these concerns, Defendant

Lofton submitted a Request for Fitness for Duty Examination form to the Board's Office of

Human Capital.  [*Id.*]  Board Rule, Section 4-13, Health Examination, states, in relevant part:

> If in the opinion of the Chief Executive Officer, or his designee, any employee of
> the Chicago Public Schools or Chicago School Reform Board of Trustees is
> physically and/or mentally unfit to perform safety and/or efficiently his job duties,
> the Chief Executive Officer or his designee may require an appropriate health
> examination by a medical professional(s) selected by the Chief Executive Officer.

[*Id.*at ¶ 36.]  On the Request for Fitness for Duty Examination form, Defendant Lofton noted that

Plaintiff has no medical documentation or accommodation on file for any physical condition,

such as hearing loss.  [*Id.*, Exhibit C, Attachment 8 (Request for Fitness for Duty Examination),

at 2.]  Defendant Lofton further noted that after an informal visit to Plaintiff's class, she noticed

that Plaintiff frequently did not seem to hear or respond to students.  In a follow up conversation

with one of the assistant principals, she was told that Plaintiff has a hearing problem to which she

does not admit.  Defendant Lofton explained that this was verified by the former principal of

Senn.  The former principal never called for a fitness for duty exam, but he did make informal

accommodations by ensuring that Plaintiff had a reduced roster of students so that she would not

have to supervise as many students.  [*Id.*]  Defendant Lofton noted that this created an inequity

of workload within the math department, so Plaintiff was given full rosters of students for the

2010–2011 school year.  The Board's Human Capital Office (now known as the Talent Office)

reviewed the Fitness for Duty request and found that the evaluation was warranted.  [*Id.* at ¶ 38.]

On Monday, March 21, 2011, when Defendant Lofton informed Plaintiff that she was referring

her for the exam, Plaintiff stated that she did not have anything wrong with her and expressed

that she did not understand why she had to go for a Fitness for Duty examination.  [*Id.* at ¶ 40.]

Dr. Homer Diadula of MercyWorks conducted Plaintiff's Fitness for Duty exam on March 22, 2011. [*Id.* at ¶¶ 39, 42.] He submitted to the Board a report in which he opined that Plaintiff was not able to perform her duties due to her significant hearing loss. [*Id.* at ¶ 42.] On March 28, 2011, Defendant Lofton received an email from the Board, informing her that Plaintiff was found unfit for duty and would be placed on involuntary personal illness leave from March 28, 2011 through March 28, 2012. [*Id.* at ¶ 43.] The Board informed Plaintiff that she was placed on involuntary personal illness leave, which would count as leave time under the Family Medical Leave Act. [*Id.* at ¶ 44.]

### d.     FMLA Leave

After being found unfit for duty, Plaintiff saw her personal physician regarding her hearing impairment. [*Id.* at ¶ 45.] The Board received a report dated September 13, 2011, from one of Plaintiff's audiologists, Mary Ann Jordan, stating that "[Plaintiff] is capable and able to function in the classroom setting when she is wearing her hearing aids." [*Id.* at ¶ 46.] Dr. Diadula of MercyWorks reviewed Jordan's report and sent the Board a letter, stating that "[Plaintiff's] new set of hearing aids will certainly make her capable to [sic] function well in the classroom and will positively impact her effectiveness as a teacher." [*Id.* at ¶ 47.] Based on Jordan's and Dr. Diadula's representations regarding Plaintiff's ability to function in the classroom while wearing hearing aids, the Board informed Plaintiff that as of September 15, 2011, she would be reinstated. [*Id.* at ¶ 48.] Thus, Plaintiff's leave extended from March 28, 2011 through September 15, 2011. When Plaintiff returned to work in the fall of 2011, she started wearing hearing aids to teach in the classroom. [See *id.* at ¶ 50; *id.*, Exhibit B, 187:13–17.] The hearing aids did not irritate her ears. [*Id.*, Exhibit B, 4–6.] She continued to wear

hearing aids from the time she returned from her leave of absence and was placed into the Reassigned Teacher Pool (discussed below) until she retired. [*Id.* at ¶ 50.]

The Board's Human Capital Office was responsible for processing reinstatements from leaves of absence. [*Id.* at ¶ 38.] Defendant Lofton played no role in determining whether or when Plaintiff was fit to return from her involuntary personal illness leave. [*Id.* at ¶ 49.] Defendant Lofton also played no role in determining where Plaintiff would be assigned upon her return from leave. [*Id.*; 113, Exhibit C (Lofton Declaration), ¶ 34.]

### 3. Plaintiff's Termination from Senn and Placement in the Reassigned Teacher's Pool

In the meantime, in the spring of 2011, the Board announced that it intended to close Senn Achievement Academy ("SAA") in the fall of 2011. [*Id.* at ¶¶ 56, 58.] SAA was a separate high school program that shared space with Senn. [*Id.* at ¶ 56.] SAA had a separate student body and teaching staff from Senn, but Senn and SAA shared an administrative staff, so when Principal Lofton was first hired at Senn, she was principal of both Senn and SAA. [*Id.*] After SAA closed, Senn and SAA were treated as one unit. [*Id.* at ¶ 58.] The teachers from SAA were absorbed into Senn to the extent that positions were available. [*Id.* at ¶ 59.] However, after merging the two facilities, there were more teachers assigned to Senn than available positions. [*Id.* at ¶ 59.]

At the time reassignment decisions were made, the Board had adopted Board Policy 11-0622-P01, which allowed the Board to conduct school-based layoffs by first laying off teachers who were not properly certified and then those who were rated unsatisfactory before considering seniority in layoffs. [*Id.* at ¶ 57.] The Human Capital Office conducted a review of budgetary adjustments at Senn to determine whether the former SAA teachers could be moved into positions at Senn or whether those teachers would be reassigned. [113 at ¶ 60.] Ultimately, five tenured teachers, including Plaintiff, were separated from Senn and placed in the Reassigned Teachers Pool in this process. [*Id.* at ¶¶ 60, 62.] The Human Capital Office identified these separations from Senn as having occurred as a result of "Drops in Enrollment" primarily due to the loss of the SAA students. [*Id.* at 60.] On July 8, 2011, while Plaintiff was on FMLA leave, the Human Capital Office informed her that she was being placed in the Reassigned Teacher Pool. [112, Exhibit 25 (Plaintiff's Reassignment Letter).] Plaintiff was 58 years old at the time.

Teachers in the Reassigned Teacher Pool receive full pay and benefits while they attempt to find another job in the district.  [*Id.* at ¶ 61.]  While in the Reassigned Teacher Pool, Plaintiff filled in for teachers who were absent, like a substitute teacher.  [*Id.*, Exhibit B, 88:24–89:11.]  A displaced tenured teacher "continues to be a reassigned teacher for no longer than ten school months or until a new appointed position is offered and accepted."  [129, Exhibit 25.]

In June 2011, an SAA math teacher, Scott Wilkerson, was assigned to position number 130376.  [*Id.* at ¶ 64.]  When SAA closed, Wilkerson was reassigned to Plaintiff's position, number 119230.  Wilkerson was able to able to take over Plaintiff's position because, unlike Plaintiff's, his most recent performance rating was not "unsatisfactory."  [*Id.*]  Plaintiff applied for other jobs at Chicago Public Schools.  [*See id.* at ¶ 74.]  However, Plaintiff testified that some of the schools she applied to did not have vacant positions and that she did not apply to any high schools because she did not want to teach teenagers anymore.  [*Id.*]  Plaintiff's Illinois State Board Education credentials allowed her to teach kindergarten through fifth grade and only math to grades 9 through 12.  [*Id.* at ¶ 66.]  Plaintiff retired on March 12, 2013.  [*Id.* at ¶ 3.]

### 4.    Request for Accommodation

On August 4, 2011, while she was on FMLA leave, Plaintiff asked the Board to accommodate her with an FM bluetooth streaming device.  [*Id.* at ¶ 51.]  Plaintiff requested to use the FM bluetooth device in lieu of hearing aids.  [*Id.*, Exhibit B, 130:1–3.]  The Board's ADA investigator conducted an investigation into whether the bluetooth device would be a reasonable accommodation for Plaintiff's disability.  [*Id.* at ¶ 52.]  The investigator learned from Plaintiff's audiologist Jordan that the device would only aid Plaintiff in small group settings or if the students in her classroom were able to pass a microphone around the room.  [*Id.*]  Jordan also informed the Board's ADA investigator that the bluetooth device may not aid Plaintiff in a

setting in which any students spoke at once. [*Id.*] Thus, the Board sent Plaintiff a letter on or about September 23, 2011—when Plaintiff was in the Reassigned Teachers Pool— informing her that her request for a FM bluetooth streamer device was denied as ineffective to accommodate Plaintiff's disability in the workplace. [*Id.* at ¶ 55.]

### C.    Procedural Background

Plaintiff filed suit in the Circuit Court of Cook County on December 3, 2012, and Defendants removed the case to federal court on December 27, 2012. [1.] Defendants moved to dismiss, arguing that because Plaintiff elected to file a charge with the Illinois Department of Human Rights, under the Illinois Human Rights Act ("IHRA"), she could not commence an action in the Circuit Court of Cook County. The Court agreed and granted Defendants' motion to dismiss on September 17, 2013, as the IHRA statutory scheme expressly states that "[i]f the complainant chooses to file a request for review with the Commission, he or she may not later commence a civil action in a circuit court." 775 ILCS 5/7A—102(D)(3). [21.] However, Plaintiff then filed a motion for reconsideration, clarifying that she *first* filed suit in state court and then sought review with the Illinois Department of Human Rights. [22.] The Court granted Plaintiff's motion for reconsideration, noting that Plaintiff's explanation of the timeline would have been helpful in response to Defendants' motion to dismiss, but concluding that since Plaintiff did not commence the lawsuit *after* a request for review with the Illinois Department of Human Rights, Plaintiff could proceed with the lawsuit. [27.]

Plaintiff filed an amended complaint on April 2, 2014. [33.] On September 30, 2014, the Court granted in part and denied in part Defendants' partial motion to dismiss. [43.] Plaintiff again moved for reconsideration, [45], which the Court denied, [52]. Currently before the Court are the parties' cross-motions for summary judgment on Plaintiff's remaining claims: allegations

of age discrimination in violation of the ADEA and the IHRA against the Board (Count I); disability discrimination in violation of the ADA and the IHRA against the Board (Count II); violations of the Rehabilitation Act § 504 against the Board (Count III); violations of the FMLA against the Board and Lofton (Count IV); and breach of contract against the Board (Count VII).

## II.    Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party.  *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).  Where, as here, the parties have submitted cross-motions for summary judgment, the Court "take[s] the motions one at a time, construing all facts and drawing all reasonable inferences in favor of the non-moving party."  *Black Earth Meat Mkt., LLC v. Vill. of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016).  However, the Court will not draw inferences that are "supported by only speculation or conjecture," *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)) (internal citations omitted), and "[c]onclusory allegations alone cannot defeat a motion for summary judgment."  *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892 (7th Cir. 2003).

It is not the role of the Court to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.    Analysis

### A.    Age Discrimination and Disability Discrimination (Counts I and II)

Plaintiff alleges age and disability discrimination under two theories: disparate impact and intentional discrimination. The Court will address each theory in turn. Plaintiff brings her discrimination claims under federal law (ADA and ADEA) and state law (IHRA). The Court will focus on Plaintiff's claims under federal law in this section and address all of Plaintiff's state law claims in Subsection D below.

### 1.     Disparate Impact Theory

For a disparate impact claim of discrimination, a plaintiff must establish that a particular employment practice causes a disparate impact on a member of a protected class. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012) (citing 42 U.S.C. § 2000e–2(k)). Plaintiff must identify "the specific employment practice," *id.*, and establish causation by offering "statistical correlation evidence demonstrating that a specified employment practice of the defendant has a disproportionately negative effect on members of the plaintiff's protected class." *Noreuil v. Peabody Coal Co.*, 96 F.3d 254, 258 (7th Cir. 1996).

Here, Plaintiff fails to identify a specific employment practice that allegedly has a disparate impact on teachers "at least 40 years of age," 29 U.S.C. § 631(a), or on disabled teachers. She argues that Defendant Lofton "used her position to inject her personal bias into (1) class assignments, (2) performance reviews, (3) teacher discipline, (4) application of school policies, (5) hiring and firing decisions." [129, at 10.] However, this general allegation does not identify a *specific* employment practice. See *Puffer*, 675 F.3d at 717 (explaining that it is not enough to "point to a generalized policy" that leads to a disparate impact). Further, Plaintiff does not cite any admissible evidence to support this allegation.

Plaintiff's disparate impact claim also fails because Plaintiff has not provided statistical support for her claim. Plaintiff does not refute or even respond to Defendants' allegation that Plaintiff conducted no school-wide discovery on the Board's evaluation or disciplinary process. Plaintiff cites to Exhibit 1 as "undisputed data" to support her disparate impact claim. [129, at 11]. However, Exhibit 1 consists of five tables with random numbers and names of employees. Plaintiff provides no foundation for this exhibit, does not identify the source or bases of the information, and does not explain who created the tables, the relevance of each table, what the

color-coding in the tables means, why some names are stricken, or what these tables purport to establish. See *Jagla v. LaSalle Bank*, 2006 WL 2796481, at *11 (N.D. Ill. Sept. 26, 2006) (striking exhibits that lacked a proper foundation). Based on the complete absence of any evidentiary basis for Plaintiff's claim, the Court grants summary judgment for Defendants on Counts I and II under the theory of disparate impact.

### 2. Intentional Discrimination Theory

Plaintiff also brings claims against the Board for intentional discrimination under the ADA and the ADEA. The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADEA prohibits an employer from discriminating against an individual on the basis of age. 29 U.S.C. § 623(a). The Seventh Circuit recently jettisoned the long-standing practice of distinguishing between the "direct" and "indirect" methods of analyzing discrimination claims. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 763–66 (7th Cir. 2016). *Ortiz* instructs courts to simply ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's * * * proscribed factor caused the discharge[.]" *Id.* at 765. The Court is to consider the evidence as a whole, rather than asking whether any particular piece of evidence proves the case by itself. *Id.*

*Ortiz* did not, however, alter the burden-shifting framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802–04 (1973). *Id.* at 766. Rather, *Ortiz* makes clear that "*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination." *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *Zegarra v. John Crane, Inc.*, 2016 WL 6432587, at *10 (N.D. Ill. Oct. 31, 2016) ("[T]he pattern identified

in *McDonnell Douglas* is just one way that the record evidence could enable a reasonable juror to find discrimination."). Because the *McDonnell Douglas* framework survives *Ortiz* and because the parties have presented their arguments in those terms,[4] the Court will first assess Plaintiff's claim under *McDonnell Douglas*. The Court will then "assess cumulatively" all the evidence presented by Plaintiff to determine whether it permits a reasonable factfinder to determine that her termination from Senn and placement in the Reassigned Teachers Pool was attributable to her age and disability. *David*, 846 F.3d at 224; see also *Smart v. DHL Express (USA), Inc.*, 2017 WL 449178, at *3 (N.D. Ill. Feb. 2, 2017).

a. McDonnell Douglas

Under the burden-shifting framework of *McDonnell Douglas*, a plaintiff must first state a *prima facie* case of discrimination by demonstrating, by a preponderance of the evidence, that: (1) she is a member of a protected class; (2) at the time of termination, she was meeting her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than younger or nondisabled employees who are "similarly situated." See *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). Once Plaintiff establishes a *prima facie* case of age or disability discrimination, the burden shifts to the employer to articulate "a legitimate, non-discriminatory reason for the employee's termination." *Id.* "An employer that has proffered a legitimate, non-discriminatory reason for the discharge is

---

[4] Defendants filed their motion for summary judgment [111] on June 17, 2016, prior to the Seventh Circuit issuing its opinion in *Ortiz*, 834 F.3d 760, on August 19, 2016. However, Plaintiff filed her cross-motion for summary judgment [129] on October 13, 2016, and Defendants filed their response to Plaintiff's motion for summary judgment and reply in support of their motion for summary judgment [135] on November 18, 2016. Thus, both parties should have been aware of *Ortiz* and should have addressed that now-controlling law.

entitled to summary judgment unless the plaintiff presents evidence that the proffered reasons are pretexts for discrimination." *Collier v. Budd Co.*, 66 F.3d 886, 889 (7th Cir. 1995).

Here, Defendants concede that Plaintiff was over the age of forty and disabled, and thus a member of the relevant protected classes. Additionally, Defendants do not dispute that Plaintiff suffered an adverse employment action. See *Ortega v. Chicago Public School of the Board of Edu. of the City of Chicago*, 2015 WL 4036016, at *13 (N.D. Ill. June 30, 2015) (concluding that a reasonable jury could find that reassignment to the reassigned teachers pool was an adverse employment action, where the policy set forth that teachers in the pool would be laid off if they were unable to secure another job in ten months). Defendants argue, however, that Plaintiff was not meeting her employer's legitimate employment expectations and that Plaintiff cannot point to a similarly situated comparator who was treated more favorably.

The record is replete with evidence of Plaintiff's performance problems. Defendant Lofton, A.P. Darroch, and A.P. Carey all observed Plaintiff's teaching during the 2010–2011 school year and noted problems with her performance. Plaintiff failed to differentiate instruction, meaning that she was unable to modify her teaching strategy to meet the needs of all of her students. [113, at ¶¶ 21, 26.] Thus, many students were not able to absorb the lessons Plaintiff was attempting to teach. They also observed that Plaintiff's lessons were teacher-centered, which means that students did not try to do the work because they had learned that Plaintiff would do it for them. [*Id.* at ¶¶ 16, 21] For example, Defendant Lofton observed that Plaintiff presented math problems on the overhead but tended to do most of the problems herself. [*Id.* at ¶ 26.] Students who did ask for help or showed confusion were not given additional explanations. [*Id.*] Plaintiff presented lessons at a low level of rigor, so students were not being presented math lessons at a high school level. [*Id.* at ¶ 27.] Additionally, the administrators

observed that Plaintiff struggled with classroom management, as students were off-task, disruptive, having personal conversations, shouting, and making inappropriate comments. [*Id.* at ¶ 29.] Defendant Lofton rated Plaintiff "unsatisfactory" for the 2010–2011 school year, and A.P. Darroch and A.P. Carey agreed that Plaintiff's performance was unsatisfactory. [*Id.* at ¶ 31.]

Plaintiff argues that her credentials "prov[e] that she meets the requirements for the position." [129, at 17.] However, this is not enough to show that she was meeting Defendants' employment expectations. Further, Plaintiff seems to ignore her admission that her performance was unsatisfactory during the 2010–2011 year. Plaintiff testified in her deposition that she agreed with the weaknesses identified by Defendant Lofton after the March 15, 2011 observation, including that she was not using recommendations from a previous observation, she was not responding to students, students were mostly off task, the classroom was disruptive with more than half of the students off task at any given time, the lesson was teacher-centered with students learning not to try because the teacher will do it for them, and there were engagement and pacing issues. [See *id.* at ¶ 24; *id.*, Exhibit B, 102:23–104:13; 244:6–12.] Plaintiff expressed that she agreed with these observations but that she wished Defendant Lofton had observed a different class, instead of her "worst class." [*Id.* at ¶ 24; *id.*, Exhibit B, 103:11–20, 104:8–13.] Simply put, the evidence of Plaintiff's poor job performance is overwhelming, and Plaintiff cannot show that she was meeting Defendants' legitimate employment expectations. See *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 603 (7th Cir. 2011) (affirming summary judgment for defendant employer and explaining that plaintiff failed to meet employer's expectations where plaintiff was rated unsatisfactory and despite having received reprimands to improve his work performance, remained an "unsatisfactory employee" after a follow-up evaluation); *Martin v. DeKalb Cty. Cent. United Sch. Dist.*, 2005 WL 1869085, at *13

(N.D. Ind. Aug. 3, 2005) ("It hardly needs explaining that a teacher who is 'unable to implement his lessons effectively,' 'lacks effective, meaningful communication with parents,' and is 'unprofessional and disrespectful toward his coworkers' was not meeting his employer's legitimate expectations).

Plaintiff argues that Defendants applied their legitimate employment expectations in a disparate manner and that the second and fourth prongs of the *McDonnell Douglas* test should thus merge. See *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (merging the second and fourth prongs "[w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner"). However, Plaintiff fails to provide any evidence to support her assertion that Defendant Lofton "applied the subjective performance criteria in a disparate manner. See *Sallis v. Aurora Health Care, Inc.*, 381 F. App'x 591, 592–93 (7th Cir. 2010) (plaintiff's argument that the second and fourth prongs of the *prima facie* case should merge failed because plaintiff did not submit any evidence to support her assertions that defendant employer was applying its legitimate employment expectations in a disparate manner, and "her uncorroborated suspicions were insufficient to stave off summary judgment"). Plaintiff has not identified any similarly situated employees who were not part of the protected class—that is, employees who were under the age of forty or employees who were not disabled—who were treated more favorably.

Plaintiff identifies Matthew Chlumsky and Samuel Conway as similarly situated comparators to whom Defendant Lofton applied the subjective performance criteria in a more favorable manner. Plaintiff contends that Chlumsky and Conway are similarly situated to Plaintiff and both took positions at Senn at the time that Plaintiff was terminated. However, Plaintiff provides no evidence—and does not even allege—that Chlumsky or Conway

demonstrated performance issues in teaching strategy and classroom management similar to Plaintiff's performance issues. See *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014) ("In general, a plaintiff who believes another individual is similarly situated must at least show that this 'comparator' * * * engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]." (citation and internal quotation marks omitted) (alterations in original)); *Weber v. Universities Research Ass'n, Inc.*, 621 F.3d 589, 594–95 (7th Cir. 2010) (affirming summary judgment for defendant employer and explaining that plaintiff failed to show that there were similarly situated comparators who received favorable treatment, where there was no evidence that alleged comparators violated employer's policies to the degree that plaintiff did or that they had trouble completing their work the way plaintiff did); *Peele*, 288 F.3d at 330 ("[I]n disciplinary cases—in which a plaintiff claims that [she] was disciplined by [her] employer more harshly than a similarly situated employee based on some prohibited reason—a plaintiff must show that [she] is similarly situated with respect to performance, qualifications, and conduct." (citation and internal quotation marks omitted) (alterations in original)).

In sum, since Plaintiff has not shown that she was meeting her employer's legitimate expectations and has not shown that a younger or nondisabled similarly situated comparator received more favorable treatment, Plaintiff has not established a *prima facie* case of discrimination under the ADA or ADEA.

### i.     Pretext

Even if Plaintiff had established a *prima facie* case of discrimination, she fails to offer evidence to demonstrate a triable issue of fact on whether Defendants' proffered reason for terminating Plaintiff from Senn and placing her in the Reassigned Teachers Pool was pretextual.

Defendants assert that Plaintiff was terminated from Senn and placed in the Reassigned Teachers Pool because (1) Plaintiff had been given an unsatisfactory rating for the 2010–2011 school year; (2) SAA was closing and its teachers were being absorbed into Senn such that there were more teachers than available positions; and (3) the Board had adopted a policy whereby unsatisfactory teachers would be laid off or reassigned before other teachers, regardless of seniority. [117, at 18.]

Plaintiff notes that the Human Capital Office identified Plaintiff's separation from Senn as the result of a "drop in enrollment" primarily due to the loss of SAA students and argues that there was no evidence of a drop in enrollment or a drop in projected enrollment between June 2011 and September 2011. However, Plaintiff cites to no admissible evidence to support the contention that there was no drop in enrollment or to support the allegation that June 2011 and September 2011 is the correct time period to evaluate. Further, even if there was no drop in enrollment, it is not the Court's role to reexamine the Board's decision to close SAA and absorb its teachers into Senn. See *Kralman v. Illinois Dep't of Veterans' Affairs*, 23 F.3d 150, 156 (7th Cir. 1994) (The Court will not "sit as a super-personnel department that reexamines an entity's business decisions." (citation and internal quotation marks omitted)). Thus, Plaintiff has not shown that there exists a triable issue of fact on whether Defendants' proffered reason for terminating Plaintiff was pretextual.[5]

---

[5] In Plaintiff's response to Defendants' Rule 56.1 Statement of Facts [129, Exhibit 56] and in Plaintiff's Statement of Additional Facts [129, Exhibit 55], Plaintiff makes some semblance of an argument that Board Policy 11-0622-P01, which allowed the Board to lay off teachers who were rated unsatisfactory before considering seniority in layoffs, did not apply to Plaintiff termination due to a "drop in enrollment." [See 129, Exhibit 56, at ¶ 57; 129, Exhibit 55, at ¶¶ 15–16.] However, this is not an appropriate place to make an argument, see *Malec*, 191 F.R.D. at 585 ("The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a forum for factual or legal argument."). Additionally, this argument is not fully developed, and thus it is waived. See *Argyropoulos*, 539 F.3d at 738 (concluding that plaintiff's

Next, consistent with *Ortiz*, the Court will assess cumulatively all of the evidence presented by Plaintiff without the assistance of the *McDonnell Douglas* paradigm to evaluate whether a reasonable factfinder could conclude that Plaintiff was terminated from Senn and placed in the Reassigned Teachers Pool because of her age and disability.  See *David*, 846 F.3d at 224; *Smart*, 2017 WL 449178, at *3.  Taking a step back and viewing the evidence as a whole, in the light most favorable to Plaintiff as the Court must, the Court concludes that Plaintiff has failed to set forth specific facts showing a genuine issue for trial on her discrimination claims.

First, Plaintiff concedes that there is no evidence in the record that Defendant Lofton made any statements demonstrating bias against older or disabled employees.  [129, at 14.]  In fact, Plaintiff testified in her deposition that she has no reason to believe that Defendant Lofton discriminated against her based on age, that Defendant Lofton never talked to her about her age, and that she had "no feelings of what [Defendant Lofton] felt about her age."  [113, Exhibit B, 144:3–16.]  Further, when asked "who at the Board do you believe discriminated against you because of your age?" Plaintiff responded, "[n]obody directly."  [*Id.*, 144:18–21.]  Plaintiff also testified that she did not recall anyone at the Board ever making any comments to her related to her age or disability.  [*Id.*, 150:21–24.]

---

argument was perfunctory and undeveloped and therefore waived).  Further, even if considered, this argument would fail because even assuming, *arguendo*, that the Board has misapplied its own policy, this does not lead to an inference of discrimination.  See *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876 (7th Cir. 2002) ("It is insufficient for the employee to show that the employer acted incorrectly or undesirably by firing him; instead, the employee must show that the employer did not honestly believe in the reasons it gave for firing him." (citation and internal quotation marks omitted); *Bienkowski v. American Airlines*, 851 F.2d 1503, 1508 (5th Cir. 1988) ("The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated.").

Additionally, as discussed above, Plaintiff testified in her deposition that she agreed with the weaknesses Defendant Lofton identified after her March 15, 2011 observation. [See *id.* at ¶ 24; *id.*, Exhibit B, 102:23–104:13; 244:6–12.] Further, Plaintiff cannot attempt to support her claim of disability discrimination by arguing that her hearing impairment—for which she did not wear hearing aids while at Senn and did not seek an accommodation until August 4, 2011, while on FMLA leave—caused her not to meet the Board's legitimate employment expectations, and thus her disability caused her unsatisfactory rating and ultimate reassignment. See *Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995) (holding that where an employee knows he has a disability, does not request an accommodation from his employer, and fails to meet the employer's expectations "due to his failure to control a controllable disease," he cannot state a claim under the ADA).

Plaintiff argues that there is suspicious timing that supports her claim of discrimination. Plaintiff contends that Defendant Lofton unduly delayed in requesting a Fitness for Duty Examination for Plaintiff. Plaintiff argues that since Defendant Lofton issued Plaintiff a Cautionary Note in January 2011 after A.P. Carey found one of Plaintiff's students in the hallway despite an intercom announcement instructing teachers to keep students in the classroom, Defendant Lofton should not have waited until March 2011 to request a Fitness for Duty Examination for Plaintiff. However, Plaintiff does not explain how this delay supports her claim of discrimination. In fact, Defendant Lofton's decision to observe Plaintiff again on March 15, 2011, before requesting a Fitness for Duty Examination, supports an inference that Defendant Lofton exercised leniency with Plaintiff and gave her an opportunity to improve her performance before deciding that a Fitness for Duty Examination—which Plaintiff resisted—was necessary.

Plaintiff also argues that her claims of discrimination are supported by the fact that Defendant Lofton advertised an available position in Senn's math department on March 30, 2011, shortly after giving Plaintiff an unsatisfactory rating on March 21, 2011 and referring her for a Fitness for Duty Examination. However, Plaintiff does not provide any evidence that this job posting was for Plaintiff's position; in fact, Plaintiff admits that SAA math teacher Scott Wilkerson was reassigned to Plaintiff's position 119230 when SAA closed. [113, at ¶ 64.]

In sum, based on a cumulative assessment of all of the evidence, viewed in the light most favorable to Plaintiff as the Court must, no reasonable factfinder could conclude that Defendants discriminated against Plaintiff because of her age or disability. Therefore, the Court grants summary judgment in favor of Defendants on Plaintiff's ADEA claim (Count I) and ADA claim (Count II).[6]

---

[6] Even if the Court were to consider Plaintiff's inadmissible unsworn, unsigned, undated declaration in Plaintiff's Exhibit 3, it would not change this outcome. First of all, as Defendants point out, Plaintiff's declaration repeatedly contradicts her deposition testimony. [See 135, at 5.] For example, Plaintiff represents in paragraph 8 of her declaration that when she started working for the Board of Education of the City of Chicago, she indicated on her application that she had a hearing impairment. [129, Exhibit 3, at ¶ 8.] However, Plaintiff testified in her deposition that the first time she informed anyone at the Board that she had an auditory impairment was when she requested an accommodation in 2011. [113 at ¶ 6; 113, Exhibit B; 112:3–20.] See *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996) ("[P]arties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions."). Plaintiff also asserts in her declaration that Gregory Norman was Principal of Senn when she started teaching at Senn and that Norman gave her "excellent" and "superior" ratings the several times he rated her. [129, Exhibit 3, at ¶ 11.] However, this is to no avail because in evaluating whether Plaintiff was meeting her employer's legitimate expectations, the Court must examine Plaintiff's performance at the time of the challenged adverse actions. *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 788 (7th Cir. 2007). Additionally, Plaintiff's declaration attests to matters outside of her personal knowledge. For example, she states: "Because Vice Principals serve at the discretion of the Principal, both Carey and Darrough [sic] began unfairly targeting older, disabled, and minority teachers at Lofton's discretion in order to avoid angering Lofton." [129, Exhibit 3, at ¶ 40.] This violates Rule 56(d), which provides that affidavits must be made on personal knowledge. See *E.E.O.C. v. Admiral Maint. Serv., L.P.*, 174 F.R.D. 643, 647 (N.D. Ill. 1997) ("[P]ersonal knowledge 'includes inferences—all knowledge is inferential—and therefore opinions. But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." (internal citation and quotation marks omitted)). Finally, Plaintiff's declaration is replete with irrelevant

## B.     Rehabilitation Act (Count III)

Next, Plaintiff claims that the Board violated the Rehabilitation Act § 504.  The ADA and the Rehabilitation Act are "nearly identical" and "the Rehabilitation Act is distinguishable only because it is limited to programs receiving federal financial assistance."  *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999).  Plaintiff alleges that she requested a bluetooth headset in the classroom as an accommodation and that Defendants failed to engage in the interactive process and ignored her request for several months until after she had been terminated from her tenured position at Senn and placed in the Reassigned Teachers Pool.  [33, at 11.]

A plaintiff alleging a failure to accommodate under the Rehabilitation Act must show that "(1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate the disability."  *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001) (citation and internal quotation marks omitted).  The employee must begin the accommodation process by informing his employer of his disability.  *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000).  The employer must then "engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances."  *Id.* (citation omitted).

Here, Plaintiff did not inform anyone at the Board that she had an auditory impairment until 2011, when she was on FMLA leave.  [113, at ¶ 6.]    On August 4, 2011, Plaintiff asked the Board to accommodate her with an FM bluetooth streaming device, which she intended to

---

information, [see, *e.g.*, 129, Exhibit 3, ¶ 41], refers to exhibits not in the record, [see *id.* at ¶ 44], and contains blank spaces in lieu of relevant information, [see *id.* at ¶ 45 ("Although Defendants allege that they do not maintain records of individuals with disabilities, I am aware of several such individuals who worked at Senn: Mr. __, Mr. __, Ms. __.  Each of these individuals was forced to leave Senn through harassment and intimidation.");  see also ¶¶ 51, 52].  Thus, even if the Court were to consider Plaintiff's inadmissible declaration, Plaintiff has not shown that there is a genuine issue of material fact sufficient to withstand summary judgment for Defendants on her ADEA and ADA discrimination claims.

use in lieu of hearing aids. [*Id.* at ¶ 51; *Id.*, Exhibit B, 130:1–3.] However, on or about September 23, 2011, the Board denied this request as ineffective to accommodate Plaintiff's disability in the workplace. The Board based this decision on Plaintiff's audiologist's opinion that the bluetooth device would only aid Plaintiff in small group settings or if the students in her classroom were able to pass a microphone around the room and that the bluetooth device may not aid Plaintiff in a setting in which many students spoke at once, which is precisely the setting Plaintiff admitted existed in her classroom. The Board had also received reports from Plaintiff's audiologist and Dr. Diadula of MercyWorks indicating that Plaintiff would be capable of functioning in the classroom with her new hearing aids. Plaintiff wore hearing aids to teach in the classroom from the time she returned from her leave of absence on September 15, 2011 and entered the Reassigned Teachers Pool until she retired. Plaintiff does not provide any evidence that she made another request for an accommodation or that she needed an accommodation once she was wearing her hearing aids. In fact, Plaintiff asserts that by the time her request for the bluetooth device was denied, the accommodation was unnecessary. [129, at 26.]

On this record, Plaintiff has not shown that a reasonable factfinder could conclude that the Board failed to accommodate her by denying her request for the bluetooth device that Plaintiff's audiologist opined would not be effective in Plaintiff's classroom setting. See *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 681 (7th Cir. 2010) ("An employer is not obligated to provide an employee the accommodation [s]he requests or prefers, the employer need only provide some reasonable accommodation." (citation and internal quotation marks omitted) (alteration in original)). Additionally, Plaintiff has not demonstrated that Defendants were responsible for terminating the interactive process. *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012) ("[A]n employee who fails to uphold her end of

the bargain—for example, by not clarifying the extent of her medical restrictions—cannot impose liability on the employer for its failure to provide a reasonable accommodation." (citation and internal quotation marks omitted)).

Finally, Defendants are entitled to summary judgment on Plaintiff's Rehabilitation Act claim under theories of disparate impact and intentional discrimination for the reasons explained in Subsection A above. Defendants are also entitled to summary judgment under a failure to hire theory. To establish a *prima facie* case of failure to hire, Plaintiff must demonstrate that (1) she is a member of a protected class, (2) she applied for and was qualified for an open position, (3) she was rejected for the position, and (4) the position was filled by a person not in the protected class who had similar or lesser qualifications than Plaintiff. *Grigsby v. LaHood*, 628 F.3d 354, 358 (7th Cir. 2010). Here, Plaintiff offers no evidence, and does not even allege, that the positions she applied for were filled by nondisabled individuals with similar or lesser qualifications than Plaintiff's. Therefore, the Court grants summary judgment in favor of Defendants on Plaintiff's Rehabilitation Act claim (Count III).

### C.      FMLA Interference (Count IV)

Finally, Plaintiff brings a claim of FMLA interference against the Board and Lofton. The FMLA entitles an employee on FMLA leave the right to return to the same position and benefits she had just before she took leave. 29 U.S.C. § 2614(a)(1)–(2). However, this right to reinstatement is not absolute. The FMLA allows an employer to "refuse to restore an employee to their former position when restoration would confer a 'right, benefit, or position of employment' that the employee would not have been entitled to if the employee had never left the workplace." *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 804 (7th Cir. 2001) (quoting

29 U.S.C. § 2614(a)(3)(B); see also *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1017 (7th Cir. 2000).

To establish an FMLA interference claim, the plaintiff must show that: "(1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." *Goelzer v. Sheboygan County, Wis.*, 604 F.3d 987, 997 (7th Cir. 2010). Next, the employer may present evidence that the employee would not have been entitled to her position even if she had not taken leave. *Kohls*, 259 F.3d at 804. The employee must then overcome the employer's assertion and show that she would have been reinstated if she had not taken FMLA leave. *Id.* at 804–05.

Here, Plaintiff alleges that Defendants interfered with her exercise of her FMLA rights by not reinstating her to her tenured teaching position at Senn when she returned from FMLA leave and instead terminating her from Senn and placing her in the Reassigned Teachers Pool. However, Defendants have presented ample evidence that Plaintiff would have been terminated from Senn and placed in the Reassigned Teachers Pool regardless of her FMLA leave. As discussed above, the record contains robust evidence of Plaintiff's performance weaknesses, as Defendant Lofton, A.P. Darroch, and A.P. Carey all noted after multiple observations of Plaintiff's classroom. Plaintiff, who admitted that many of the observed weaknesses existed, was rated "unsatisfactory" for the 2010–2011 school year. When SAA closed and SAA's teachers were absorbed into Senn, the Board first laid off teachers who were not properly certified and then those who were rated unsatisfactory, including Plaintiff, before considering seniority.

To overcome Defendants' assertion that Plaintiff would have been reassigned regardless of her FMLA leave, Plaintiff again insists that Defendants' explanation that teachers were

terminated from Senn due to a drop in enrollment is pretextual. This argument fails for several reasons. First, in the context of an FMLA claim, "pretext may have evidentiary value, but showing pretext does not necessarily satisfy the employee's burden [of proving a violation of the FMLA]." *Kohls*, 259 F.3d at 806. Additionally, as discussed above, Plaintiff cites no admissible evidence to support her claim that there was no drop in enrollment. Since Plaintiff has not offered any evidence linking her reassignment to her FMLA leave, no reasonable factfinder could find that Plaintiff has met her burden of proving an FMLA interference claim, and Defendants are entitled to summary judgment on this claim (Count IV). See *Simpson v. Office of Chief Judge of Circuit Court of Will Cty.*, 559 F.3d 706, 712 (7th Cir. 2009) (affirming summary judgment for defendants on FMLA interference claim where plaintiff "offers hardly any evidence linking her termination to her leave-taking"); cf. *Goelzer*, 604 F.3d 987 at 994–95 (concluding that summary judgment for defendants was not proper where "[a] jury might be swayed by comments [employer] made that could suggest frustration with [plaintiff's] use of FMLA leave").

### D.    State Law Claims

Given the foregoing conclusion that Defendants are entitled to summary judgment on Plaintiff's federal claims, the Court must consider whether to exercise its supplemental jurisdiction over Plaintiff's remaining state law claims.[7] Where a district court has original jurisdiction over some claims, it has supplemental jurisdiction over other claims that are so related that they form part of the same case or controversy. 28 U.S.C. § 1367(a); *Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010). If the court has dismissed all claims over which it

---

[7] Plaintiff's remaining state law claims are: age discrimination in violation of the IHRA against the Board (Count I); disability discrimination in violation of the IHRA against the Board (Count II); and breach of contract against the Board (Count VII).

has original jurisdiction, the court's supplemental jurisdiction persists, but the court has discretion to decline to exercise supplemental jurisdiction. 28 U.S.C. § 1367(c)(3); *Miller*, 600 F.3d at 738 (noting that the decision whether to exercise supplemental jurisdiction is "squarely within [the district court's] discretion"). As the Seventh Circuit consistently has stated, "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); see also *Wright v. Associated Ins. Co., Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("When all federal claims have been dismissed prior to trial, the principle of comity encourages federal courts to relinquish supplemental jurisdiction[.]"); *Patrick v. City of Chicago*, 662 F. Supp. 2d 1039, 1068 (N.D. Ill. 2009) (granting summary judgment in favor of defendants on federal claims and declining to exercise supplemental jurisdiction over state law claims). Exceptions to this general rule exist:

> (1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

*Davis v. Cook Cty.*, 534 F.3d 650, 654 (7th Cir. 2008) (citation and internal quotation marks omitted).

Here, none of the exceptions applies. First, Illinois has adopted a "rule of tolling," which provides that if an action "is dismissed by a United States District Court for lack of jurisdiction, * * * then, whether or not the time limitation for bringing such action expires during the pendency of such action, the plaintiff * * * may commence a new action [in state court] within one year or within the remaining period of limitation, whichever is greater, after      * * * the action is dismissed by a United States District Court for lack of jurisdiction." 735 ILCS 5/13-

217; see also *Davis*, 534 F.3d at 654; *White v. City of Chicago*, 149 F. Supp. 3d 974, 983–84 (N.D. Ill. 2016).  Second, this Court has not yet committed "substantial judicial resources" to considering the merits of Plaintiff's state law claims.  See *Davis*, 534 F.3d at 654 ("the district court disposed of the federal claims on summary judgment, and so 'substantial judicial resources' have not yet been committed to the case").  Third, it is not clearly apparent how the state law claims would be decided.  In these circumstances, the usual rule applies and dictates dismissal without prejudice of Plaintiff's state law claims in Count I, II, and VII.

## IV.    Conclusion

For the reasons stated above, the Court grants Defendant's motion for summary judgment [111] and denies Plaintiff's cross-motion for summary judgment [129] as to Plaintiff's federal claims in Count I (ADEA discrimination), Count II (ADA discrimination), Count III (Rehabilitation Act violation), and Count IV (FMLA interference).  Plaintiff's remaining state law claims in Counts I, II and VII are dismissed without prejudice.  The Court will enter a final judgment and close the case.

Dated: March 17, 2017
                                                         _____
                                                         Robert M. Dow, Jr.
                                                         United States District Judge